**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**

**v.**                                              **Criminal No.  1:22-CR-51-3**
                                                   **(Chief Judge Kleeh)**

**SEAN MCKINNON,**

                    **Defendant**.

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
CONSIDER MOTION TO REVIEW DETENTION ORDER OUT OF TIME (Doc. No. 61)**

  Comes now the United States of America, by and through William Ihlenfeld, United States Attorney, and Brandon S. Flower, Assistant United States Attorney, with its Response in Opposition to Defendant's Motion to Consider Motion to Review Detention Order Out of Time (Doc. No. 61).   For the reasons stated below, the United States opposes the motion and respectfully asks that this Court deny the Defendant's request to review the detention order and release the defendant.

**Procedural and Factual Background**

  1. On October 29, 2018, the defendant, Sean McKinnon, was an inmate at USP Hazelton.  The defendant was assigned to the F-1 housing unit and was a cellmate with co-defendant Fotios Geas, aka "Freddy" (Geas) in cell 125.  The defendant spoke with his mother by phone that evening and told her that another inmate, James "Whitey" Bulger (Bulger), was transferring to the prison.  His mother was concerned and told the defendant to stay away from Bulger.  The defendant told her that he could not do that because he and Bulger were in the same group.

1

2.      Later that evening, Bulger arrived at USP Hazelton.  After going through the intake process, staff escorted Bulger, who was in a wheelchair, to the F-1 Unit.  Inmates in the F-1 Unit were already locked in their cells for the night when Bulger arrived.  Bulger was placed in cell 132, a handicap-accessible cell.

3.      Shortly before 6:00am on October 30, 2018, staff released inmates in the F-1 Unit from their cells.  Co-defendant Paul DeCologero, aka "Pauly," (DeCologero) exited his cell, cell 229, and went to Geas and the defendant's cell.  Over the next several minutes, the three inmates exited and reentered cell 125.  On at least three occasions, all three inmates were together in the cell.

4.      Around 6:06am, Geas and DeCologero left cell 125 and went to Bulger's cell. DeCologero entered first followed by Geas.  They remained in the cell for approximately 7 minutes.  During this period, the defendant spent most of his time sitting at a table looking towards cell 132.  Geas and DeCologero exited Bulger's cell at 6:13am.  They went back to cell 125 where the defendant met them.

5.      Around 8:00am, staff conducted rounds in the F-1 Unit.  Officers went to Bulger's cell.  They observed Bulger laying in his bed with a blanket pulled over most of his head.  Bulger did not respond to prompts from the officers.  The officers noticed blood on Bulger's head and radioed for a medial emergency.  When the officers pulled back the blanket, they saw that Bulger's eyes were swollen and blood was on his face.  The officers began life-saving medical treatment.

6.      Staff transported Bulger to the health services department where he continued to receive medial treatment.  He was pronounced dead at 9:04am.

7.     Special Investigative Services (SIS) staff reviewed the surveillance video and observed Geas and DeCologero go into Bulger's cell.  SIS also noted that no other inmates entered or exited the cell, except for Bulger's cellmate.  SIS also observed the defendant's actions throughout the time period as noted above.

8.     On October 30, 2018, the FBI interviewed the defendant about Bulger's death. He said he was not aware of what happened to Bulger.  He claimed he learned about Bulger from reading about him.  He said he heard a rumor the day before that Bulger was coming to USP Hazelton.  The defendant said Geas was his cellmate.  He said the night before that he watched a New England Patriots game and Geas went to bed early.  He stated that he woke up that morning, did laundry, ate breakfast, and looked for his radio in the unit.  He said he spoke with Geas and DeCologero, but did not discuss Bulger.  He claimed he did not see them go into Bulger's cell.  He claimed that when he and Geas were locked down (after Bulger's body was found), they played cribbage.  He said Geas did not act strangely.  He did not see blood on Geas or injuries to his hands.  The defendant claimed he did not know anything about the Bulger incident.

9.     The West Virginia State Medical Examiner conducted an autopsy of Bulger.  He observed multiple blunt force injuries to Bulger's head.  He identified brain hemorrhages, contusions, and lacerations to Bulger's head.  The medical examiner found that Bulger's eyes had been cut with a sharp instrument and that he had a stab wound in his cheek.  The medical examiner determined that the cause of Bulger's death was blunt force injuries to his head and the manner of death was homicide.

10.     On November 15, 2018, the defendant placed a telephone call to his mother. During the call he explained he was in the Special Housing Unit (SHU) because of the Bulger homicide investigation.  He told her that Geas and another guy were the ones that went into Bulger's cell.

11.     The defendant made admissions to at least two other inmates with which he has been incarcerated.  In 2021, the defendant and DeCologero were housing in the SHU at USP Hazelton.  An inmate was placed in the cell across from them.  They began speaking with the inmate and eventually told the inmate that they were involved in the Bulger homicide.  The inmate asked them if they were the guys that killed Bulger.  They said yes.  DeCologero told him that he and his cellie (the defendant) were in the SHU for the Bulger incident.  DeCologero said Freddy (Geas) was involved too.  DeCologero said they used a lock to assault Bulger. DeCologero told him that Bulger was a snitch and he volunteered to put in the work. DeCologero said as soon as they saw Bulger come into the unit that they planned to kill him. The inmate clarified that DeCologero meant Geas, the defendant, and himself when he said they planned to kill Bulger.  The inmate said DeCologero told him that the next morning they went directly to Bulger's cell and told his cellmate to leave.  Bulger was using the bathroom and began yelling at them.  DeCologero said he and Geas went into the cell and the defendant was a lookout.  DeCologero said that they used locks to kill Bulger.  DeCologero denied using a knife or sharp weapon.  The defendant told the inmate that he was the lookout.

12.     In September of 2022, the defendant made admissions to another inmate in a Florida jail.  The inmate advised he began speaking to the defendant.  The defendant referred to the Bulger case and was calling Bulger a "snitch" who worked for the FBI.  The defendant said

that in USP Hazelton he plotted with Geas and DeCologero to kill Bulger the day before the homicide.  The defendant wished to participate more in the homicide, however, he was assigned the task of "lookout."  The defendant said that Geas and DeCologero were the ones who actually did the killing.  He said they used a lock to kill Bulger.  He stated that Geas said if the defendant were to ever get caught up in the homicide case, he (Geas) would take the charges.

13.     On August 17, 2022, a Federal grand jury sitting in Clarksburg returned a five-count indictment against Geas, DeCologero, and the defendant.  The indictment charges the defendant in Count One with Conspiracy to Commit First Degree Murder, in violation of 18 U.S.C. § 371, and in Count Five with False Statement to Federal Agent, in violation of 18 U.S.C. § 1001(a)(2).  Doc. No. 1.

14.     On August 19, 2022, a magistrate judge for the Middle District of Florida convened an identity hearing.  The defendant waived his right to an identity hearing and consented to his appearance in the Northern District of West Virginia.  Doc. No. 6-3.

15.     On August 22, 2022, the magistrate judge, following a detention hearing, entered an order detaining the defendant.  The court found that the government established "[b]y clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community," and that the government established "[b]y a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required."  Doc. No. 6-8.  The court also found that weight of the evidence against the defendant was strong, he is facing a lengthy prison sentence if convicted, he has a significant prior criminal history, a history of violence or use of weapons, a lack of ties to MDFL, a history of alcohol/substance abuse, prior failure to

attend court, and prior attempts to evade law enforcement.  Id.  Further, the court made specific factual findings:

> a.   The Government proffered evidence of the defendant's involvement in the alleged offenses charges here, including video of the defendant with his co-defendant who are alleged to have committed the murder;
>
> b.   The nature of the offenses charged, the proffered evidence, and the defendant's criminal history make him a danger to the community and a flight risk.

Id.

16.     On September 23, 2022, this court held an arraignment.  The defendant entered pleas of not guilty to both counts.  The court remanded the defendant to the custody of United States Marshal's Service per the order of the United States District Court in the Middle District of Florida.

17.     The defendant's criminal history begins in 2004 when he was convicted of Petit Larceny (misdemeanor) in Vermont.  In 2006, he was convicted of Buying, Receiving, Selling Possessing, or Concealing Stolen Property (misdemeanor).  He was placed on probation, but it was later revoked.  He was convicted of Assault & Robbery with Weapon/Attempt (felony) in 2007 and sentenced to 2-4 years imprisonment.  In 2008, he was convicted of Vehicle Operation-License Suspended/OSC and False Info to a Law Enforcement Officer.  In 2011, the defendant was convicted of Malicious Destruction of Property over $250 (felony) and Disturbing a Correctional Institution (misdemeanor) following a riot at a Massachusetts prison.  He was sentenced to one year to one year and a day.  In 2015, the defendant was convicted in the United

States District Court for Vermont for Theft of Firearms (felony) and sentenced to 96 months in custody.  The defendant was serving this sentence at USP Hazelton at the time of the offense charged in the instant indictment.  Lastly, he has violated the terms and conditions of probation in the past.

18.     The defendant had numerous disciplinary violations while incarcerated in the Federal Bureau of Prisons between 2016 and 2018.  He accumulated violations for destroying property (x2), possessing drugs/alcohol (x5), destroy/dispose item, and stealing.  Exhibit 1, Defendant's BOP disciplinary record.

## Argument

19.      A defendant can seek review of a magistrate judge's order of detention by filing "a motion for revocation or amendment of the order.  The motion shall be determined promptly." 18 U.S.C. § 3145(b).  The district court reviews the order of the magistrate judge *de novo*. *United States v. Williams*, 753 F.2d 329, 333 (4th Cir. 1985); *United States v. Clark*, 865 F.2d 1433, 1437 (4th Cir. 1989).

20.     The court "shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person or the community...in a case that involves…an offense for which a maximum term of imprisonment of ten years or more is prescribed by the Controlled Substances Act (21 U.S.C. 801 et seq.)…"  18 U.S.C. § 3142(f)(1)(C).  When deciding to detain a defendant, the court must make findings based on clear and convincing evidence "that no condition or combination of conditions will reasonably

assure the safety or any other person and the community."  Id.  The court must consider several factors:

> **(1)** the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> **(2)** the weight of the evidence against the person;
>
> **(3)** the history and characteristics of the person, including--
> **(A)** the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> **(B)** whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> **(4)** the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g)(1-4).

21.    In his instant motion requesting the court to review his detention, the defendant argues that he is not alleged to have committed any violent act, while acknowledging the alleged offense in Count One is a violent offense.  Further, he argues the weight of the evidence against him is weak.  Lastly, he argues that he can live with his mother in Ocala, Florida, and be subject to home detention.  He asserts he can resume employment.

22.    Despite the defendant's claims, the nature and circumstances of the instant offenses, his criminal history, and personal characteristics demonstrate the defendant is a danger to the community and a flight risk.  There are no conditions or set of conditions that the court can impose to alleviate those concerns.

23.    The "nature and circumstances of the offense[s] charged" in this matter are quite

serious and create a substantial danger to others and the community.  18 U.S.C. § 3142(g)(1).
The defendant served as a look out during the assault and murder of Bulger while the defendant
was incarcerated at USP Hazelton.  The co-defendants engaged in a brutal attack that left Bulger
with multiple injuries to his brain and head.  Those injuries resulted in his death.  Not only did
the defendant act as the look out, but he later told another inmate that he wanted to be more
involved in the murder.

24.     The weight of the evidence against the defendant is very strong.  The defendant
argues that the evidence against him is weak because the Government relies upon statements
from inmates, which lack credibility.  The defendant makes these assertions while overlooking
the evidence that corroborates the information provided by other inmates.  The BOP surveillance
system captured the actions of all the defendants while in the F-1 Unit.  Although the assault and
murder were not captured on video because the incident occurred in a cell, the defendant's
movements and actions in the common areas are visible.  Further, the defendant's telephone calls
to his mother and his admissions to other inmates show he had prior knowledge that Bulger was
coming to USP Hazelton, who was involved in the murder, and confirm his role as a look out.
Moreover, the information learned by other inmates occurred more than a year apart and at
different institutions.  Despite this, the information the defendant provided both inmates was
consistent.

25.     As to the third factor relating to the defendant's history and characteristics, the
defendant's lengthy and continuous criminal history illustrate why he is a danger to the
community.  He has multiple felony convictions, including one for Assault & Robbery with
Weapon/Attempt.  His prior Federal conviction was for the Theft of Firearms.  He admitted to

trading the firearms for controlled substances.  His convictions, and current charges, also involve providing false information to law enforcement.  The magistrate judge found this factor important since the defendant would be supervised by a Federal probation officer.   Further, he has violated the terms and conditions of his probation in the past.  Lastly, he incurred numerous disciplinary violations while in BOP custody, including possessing drugs/alcohol, destroying property, and stealing.

26.    The defendant poses a serious risk to the safety of the community.  The above facts and circumstances clearly show that the defendant is an individual that will ignore the law and place the safety of other individuals at risk.

27.    Lastly, the defendant has not identified any condition or set of conditions that the court could impose that would guarantee the safety of others and the community.  The defendant may assert that he could live at a residence subject to electronic home confinement and that he has employment.  However, his track record shows multiple instances of failure to comply with court orders, including probation, and engaging in a pattern of criminal behavior.  Many of his convictions involve violence and firearms.

WHEREFORE, for the reasons articulated above, the Government requests that the court find the defendant is a flight risk and that no condition or set of conditions can ensure the safety of others or the community, and order the defendant remain detained.

Respectfully submitted:

UNITED STATES OF AMERICA,
WILLIAM IHLENFELD
United States Attorney

/s/ Brandon S. Flower
Brandon S. Flower, WVSB #9338

10

Assistant United States Attorney
320 West Pike Street, Suite 300
Clarksburg, WV 26301-2710
Telephone: (304) 234-0110
Brandon.flower@usdoj.gov

**CERTIFICATE OF SERVICE**

I, Brandon S. Flower, certify that on November 30, 2022, I electronically filed the foregoing with the Clerk using the CM/ECF system, which will send notification of such filing to counsel for the defendant.

   /s/   Brandon S. Flower
Brandon S. Flower, WVSB #9338
Assistant United States Attorney
United States Attorney's Office
320 W. Pike Street, Suite 300
Clarksburg, WV 26301-2710
Telephone: (304) 234-0110
Brandon.flower@usdoj.gov